Good morning everyone and please be seated. People versus Garcia. Alright, before we begin, I would ask both of the attorneys that are going to present oral arguments to step up to the bench, identify yourselves for the record. Alright? Both lawyers with us today. Good morning. All in favor who stayed. I may have the people who stayed. You will have about 15 minutes to present oral argument and from that counsel, you may reserve some time for rebuttal. Yes. All right. All right. Good morning and you may begin. Good morning. May it please the court. This case is about Adrian Garcia's chance to be heard. This is the first stage post-conviction petition. The case that issued, the issue of the case is whether my client was one of a number of participants in a failed meeting. Who I witnessed directly states that my client did not commit the meeting. She says in fact that he was out there trying. Well, counsel, she says he was there. He was just there helping. Right? He was trying to, that's her testimony, that your client was actually not a participant but was actually trying to help him. He was present. Exactly. So in a first stage hearing, it's, the standard is, is there anything positively rebutted in the record of these allegations, correct? I'm saying that inartfully, but you get what I'm going at. That's how we evaluate whether it's arguable. Okay. So, for example, what that would mean here, Your Honor, is the fact that there is a different occurrence witness testimony from Dominion. We wouldn't rebut it because that's just a clash of different witnesses' testimony. Well, wouldn't this fall in that same category? I would suggest it's a lot like that decision that the Illinois Supreme Court recently put out. In some of those other cases, and Robinson more recently, that says when we have a clash of witness testimony, then we don't say it's rebutted by the record. And that comes up in both of these different claims that were raised in the appeal. The question, I suppose, of prejudice for ineffective assistance of counsel. Is there a reasonable probability of a different result? The Illinois Supreme Court in Allen v. Robinson says, well, let's see what would happen if the jury believed the witness. And here, if the jury believed, you know, if the jury believes, the right mark to say is attestation. That, like he originally told the police, my client was there to help and not participate. But, counsel, there was also physical evidence, such as the footprint that was most likely defendant's footprint on the day that appeared to be where the other witnesses testified that he was stopped, which caused his death. So, that also kind of rebuts that I'm just here to help, doesn't it? Well, first, I suggest you first face standards. So, if it looks like there's a balance, that's a balance we can weigh down the line and have a mature hearing. Hodges, of course, was the most cited case for that. Well, but this was whether counsel was ineffective, right? So, it's a little bit different of a wrinkle. Is counsel ineffective for not finding this witness that defendant never knew about either, right? Well, in order to determine what counsel did and did not do in the constitutional decisions Mr. Lopez made, we have to get on the stand and get an affidavit from him at the second stage. At the first stage, there was a report set up. Are there any allegations that defendant told his counsel about these? There is no indication in this record that defendant told his counsel about it. He's not claiming he told his counsel either, is he? No. But let me ask you this. How do you get to the idea that the lawyer should have known about this witness? That's, I think, the crux of this case. Where or how do we conclude that he was ineffective, the lawyer, deficient, because he should have found this person? Well, it's a question of, as Strickland tells us, reasonable investigation or reasonable decision to cut off that investigation. Right. But what cases say that a lawyer, like in these facts, should have reasonably investigated a person that was unknown to everyone? Well, the reasonable investigation here is the question of who witnessed this incident on the street. And even without the discovery that we don't have access to him on post-conviction, we know, well, there's one state's witness happens to live in the first floor apartment of this building. The other state's witness is on the third floor apartment of the building. It's a question of, you know, what did they say? Now, I don't know. I'm guessing it wouldn't surprise me if detectives happened to knock on their door, too, and go around the neighborhood and there might be something of discovery about that. I don't know the answer to that. How many years after the trial did this witness come forward? I don't know. I'm aware that the family tracked it down. But it's not very long after the trial because it's a 2011 case. All right. Let me ask you, going back to something you said. You said that if a jury believed this person. Okay. Now, have we – I'm sorry about it, but maybe perhaps I don't quite understand. But you have all the other witnesses that testified. And one of the things Justice Burke pointed out was this footprint impression on the chest of the deceased victim. But if we – are we supposed to presume we know? We don't decide facts. We review everything de novo. But do we also assume that we – a jury must believe her? That's what Robinson holds for. And how does Robinson really say that on review, the reviewing court must hold that if the jury believes? So are we doing away then with the most conclusive element or not? That would be if you think that Robinson's holding effectively did away with that element. Now, if we had a witness that says, oh, I just had some new impeachment evidence, that wouldn't be the kind of thing. Okay. But whenever a new witness comes up and that contradicts or supports a defense, then the fourth element, the most significant and most important, is simply erased. Well, it's satisfied if the witness says, I witnessed this event and the defendant didn't do it, here's what happens. And that's what we have here to say that. And what language would you pull out of Robinson that says what you're saying? I would look through – and I don't have a language in front of me. I would look through exactly how she did that and what staff did. And you could be correct. You could be correct. But I think that position would mean that there is no longer a consideration of so conclusive that, you know, the result of the trial would have been different. Well, remember, all we're trying to do here is get to the sentence stage. Yes. I know that. I think we all understand that. Some of these cases, I suppose, the national innocence go quickly to a third stage. The judge says, I don't believe this witness in light of the other three or four occurrence witnesses' testimony, and it falls there. So sometimes there might be a bureaucrat casting them to light. That's a cause that the Illinois Supreme Court, from Washington on, has been willing to shoulder because of the sheer unsealingness of holding innocent people in prison. But I think one of those, you know, cases beforehand specifically said, you know, well, an ailed eyewitness is in the hands of the, you know, defendant, and that's not going to get you so conclusive. But you're saying, Robinson, and we will search that language, too, but you're basically saying, Robinson says that if you have a new eyewitness and that witness says, I saw it a different way, that there is no real consideration of so conclusive. Well, it's satisfied there because we accept the witness is true, and we accept that the witness is seen as true in this case that he's out there trying to stop the fight and that he was falsely accused. Yeah. And that's necessitated. Now, there might be circumstances. Well, what if the footprint evidence only tied up with him? They had shoes. It matched. I mean, how do you get past that? Well, Your Honor, the shoe print evidence isn't DNA evidence. Even in this case. But there was DNA evidence that obviously. I mean, everything sort of pointed to him, but the explanation that he gave would be the only way to contradict any of it, right? I was there to help. I was trying to. But isn't that, I mean, kind of that does take everything out. And it's accepted by SAIA. Those explain a lot of this evidence. It means that some of the presence evidence lies there to see. What about comparing? Remember that Robinson still has this analysis that you look at the old and the new. And then I do think you still, the judges in the trial courts and the judges in the reviewing courts, we do look at the old with the new, and we still consider the elements of equanimity. But, again, this is in the context of ineffective assistance in counsel. If you can't get past that, are you, do you have a problem? Well, of course, prejudice has a lower burden than actual innocence. Yes. So I would have to say it's a reasonable probability, you know, for different results to look at cases like Tate, just trying to think of a separate court as to what happens then. You know, we credit this evidence. We're not going to credibility it, but it's an evaluation at this stage. But as a trial judge, we're reasonably likely to have a different result. And given what her attestation is, that's another conclusion we have to draw here. Now, if it was something in the marginal, if it was just this part of the affidavit where she explains why Ryder Dominguez, the State's self-witness, had an incentive to lie, if that's all we have, then it would be a much more, much deeper question on prejudice, just, you know, eliminating one witness' testimony. The trial judge in this case for the post-conviction hearing was the same as the judge who actually conducted the trial. Is that right? Does that cut against you, or does that... It means nothing because we're here in a minimum review for a state petition. And frankly, if we follow the language of the Act, it won't go back to him. But it's because of just court practices that are going to bring him back to Judge Sacks. And it's worth noting some of the remarkable things in this order. Judge Sacks seems to think that only if a witness is told that an attorney has no obligation to investigate unless he's actually told about the witness. Now, it was not hard to find a half-dozen U.S. Supreme Court cases that detailed that an attorney does have the duty to investigate more than what just his client tells him. And that's the basis for this case. If we did try to defer to Judge Sacks, it would be in abuse of discretion. We have to reverse that. Well, we're looking at this de novo, and I think we all understand that. But I still want to go back and hold you to this, or at least probe a little more. Yes, ma'am. So you have this Robinson case, and those before it, that says you look at the old and the new. And in this case, you have eyewitnesses. You have this testimony that the defendant was in that beating. He stepped on him, kicked him. And you have this other forensic evidence, a footprint on his chest related to this defendant. You have the co-defendant testifying against him. You know, he admittedly had a deal. But so are we really saying, then, that we don't look at that evidence? Because if we do, is it like you look at the evidence, but then again, if there's a new eyewitness, I mean, what does this conclusiveness mean if we don't have it anymore? It seems to me that there's something, there's a disconnect. If we're supposed to look at the old and the new, well, what if we, I mean, do we not say a jury wouldn't believe them because they already did? They already believed the testimony. They believed the testimony and found him guilty. Your Honor, first, of course, I would remind you that the first stage of the solution is coming out, is coming out of successful petitions, which are much higher standards. As to the shoe printouts, just as a matter of fact, I mentioned that this is a DNA test. Right. There's literally two shoe prints matching three different co-defendant's shoes. I thought, I feel like the testimony, he was eliminated on one of those. There's a number of shoe prints that we've seen. Right, but the one side is chest. There's a number of solutions linked by clients' commerce, and there's a linking which ends up linking to two of the different co-defendants, different sized legging shoes. So there's, we're not talking about the precision of the DNA. Yeah, except that there was the DNA to them. Well, the DNA indicates he's present. When, and there's no real dispute that he was present. It's, you know, not just this witness after the fact that's saying he was there actually trying to stop them. That was his initial statement to Officer Lewis right after the event. Right. So this isn't coming, this isn't a late discovery. No. This isn't, you know, Mr. Hodges, my cellmate, happened to be driving by the scene of the shooting where three guys saw him put six bullets in the guy's back. I mean, it's, if you credit that kind of affidavit, but the University of Important Hodges said it must certainly be worth the state of this affidavit that's consistent, describes the same kind of general punishment. And I know also, you know, this wasn't an open and shut, everybody's perfectly consistent. Here, let me ask you this. Is your, your position is a very simple position. And your position is that it's at least arguable that counsel has a duty to investigate and present potential witnesses in the immediate vicinity of the crime. Isn't that your position here? Yes. It's arguable. That is at least arguable. It's at least, and that's what the standard is at the first stage. That's the standard at the first stage. Okay. And it's also arguable that testimony from a disinterested witness cooperating defendant's account may have changed the jury's verdict. Isn't that your position? That is up to the judge. Simple? Yes. Simple as that. Nothing else? Your Honor, I would love to talk about the nature of the offering standard. Well, you can talk about anything else, but this is what the standard is. And that's your position. I would like to, I would like to, I'm happy to save that for another day. We have an express exculpatory offering affidavit. This is a first-stage post-conviction petition. And my client, Mr. Garcia, certainly has a chance to be heard. Now, I see my time is running a bit low. If Your Honor has further questions, I'd be happy to answer them. We'll save you some. We'll permit your time for rebuttal. Thank you. All right. Thank you. Your Honor. Please report. Counsel, let me ask you the same question. Is it not at least arguable that counsel has a duty to investigate and present potential witnesses in the immediate vicinity of the crime? Yes or no? Yes, in the immediate vicinity. Okay. And is it not at least arguable that testimony from a disinterested witness cooperating with the defendant's account may have changed the jury's verdict? Not in this case. Okay. Well, tell us why. Because in this case, as the justices were discussing with counsel, the only well-pleaded facts, including affidavits, facts stated in affidavits, in the context of old record, and facts which are refuted by the record, even well-pleaded facts, are not accepted as true. Okay. The defendant's testimony directly refuted the information in the affidavit. The DNA evidence, there's no explanation in the affidavit that would raise the question about how the DNA evidence ended up on the defendant's hands. Well, I think the defendant's position is he was there. It's just his intention was not for harm but to help the victim. So that would explain his DNA presence there. They're not contending that he wasn't there. No, his DNA evidence, he had the victim's DNA evidence on his hands. And as this court already found, that supported one inference and one inference alone that the defendant launched Correll, Mr. Correll, in the head. The DNA evidence on his shoe matched Correll's blood. That evidence, as the court found in direct appeal, supported one inference that the defendant kicked Correll. And when we talk about the shoe evidence, the court, as has been pointed out, the stop marks on the defendant's shirt were consistent with the defendant's shoe, but they were inconsistent with the other two defendant's shoes. But Ortiz's shoe was consistent with marks on the head, and that, again, corroborated our eyewitness testimony that Ortiz kicked the defendant in the head. What about counsel's comment that, you know, the shoe print evidence is really not at the level of DNA? You would agree with that, wouldn't you? Absolutely, it's not DNA. Okay. And in terms of accepted evidence, I mean, is it – I'm not sure you can say that it's anything even close to DNA. Okay. You know, I mean, the testimony was that the examiner had an opinion that this could be from a Nike shoe and that the defendant's shoes were recovered from his apartment. I think it was a little stronger than that. Okay. Well, tell us. Tell us what makes it more strong. Well, again, take the circumstances into consideration. One, you have three people that were implicated as being involved, and the defendant doesn't dispute that. And this new affidavit says there were two people that the defendant was trying to intervene against. Okay. Those three people, the shoes were tested. The defendant's shoe was found consistent with the stop marks. The other two were eliminated. And again, as we noted, Ortiz's shoe was confirmed to have been the shoe that kicked Mr. Correll in the head. So when we look at it – The victim's blood was on the shoe. Well, the victim's blood was on the defendant's shoe, but what we're talking about were the shoe prints, right? Right. No, but then you also said that there was blood matching the victim on the defendant's shoe. Correct. Which suggested that he hit – he kicked him in the head. Or some other part of his body actually bleeding. Right, yeah. I mean, there was testimony from another eyewitness that there was a kicking by the defendant. Absolutely. Okay. But I was – we were talking about the truth of the evidence, so I'm saying it was isolating to that. The DNA, though, is important because in the samples taken off the defendant, not only was the victim's blood either matched or could not be excluded, but the other two assailants could be excluded. So it's not a situation where the defendant rubbed one of the other defendants who was covering the victim's blood and got blood on himself or something like that. Again, when we look at what the sample data says in the context of the record as a whole, which is exactly what the courts require. But what if Mr. Giesting's, let's say, description of Robinson and other cases, is that we have to accept – we have to accept that a jury would have believed the person. That's kind of mandatory, isn't it? Well, it can't be. It makes no sense. Well, explain it to me because it's been read the way Mr. Giesting is reading it, that if a jury believed her, if a jury believed this woman, then why would they ever convict him? Well, if we have to assume that the jury must and would believe the testimony, then aren't we assuming the case right out the door? Well, I think there's some problems with that interpretation. Yes, I agree with you. I think it does away with the conclusiveness. But I think that Mr. Giesting has made a valid argument about if a jury were to believe her, then it's arguable the outcome might be different. Let's take that. What's there to believe? Okay, what facts does she add that could result? Completely corroborates his defense that he was not there to participate in the beating. He was trying to help or stop it. She contradicts his defense. He told two different stories. He said, one, that there were three, I think he said, pisas, which he referred to as illegal immigrant expulsions. He said there were three pisas that were attacking Mr. Corral, and that's where he quarreled, and that's where he jumped in. So that was story number one. Her affidavit says there were two men beating, so it contradicts that story. Plus, the evidence is overwhelming that we know who those two men were, Sencio and Ortiz, who were not three men, unknown men who just happened to walk. His other story involved Mr. Rojas. He said, well, Rojas and Corral got into it outside the bar, and I punched Rojas in the nose. Well, the affidavit actually has nothing to do with that. It doesn't support that theory, and that theory was debunked by the other evidence in the case. So at the end of the day, Secio's affidavit does not corroborate anything that he told the police that was entered into evidence at the trial. There's other problems with her affidavit. One, because we don't know at what point in the proceedings or the events that she first happened upon the scene because she doesn't tell us. All we know is that Corral was found. That's it. At that point, she's going to say who she saw stomping on who or whatever, and then she says— You're doing credibility determinations, aren't you? No, I'm not. I mean, what does she actually say in that affidavit? What's the content? Okay, okay. And what we need to focus on are facts, not opinion. And her impression, oh, he was intervening or he was trying to stop the fight, that is an opinion. That's not a fact. She can't read his intent. Okay. All she said is, I heard him say somebody in effect stopped the beating, and he even at one point stood between them. That doesn't tell the jury much of anything because we know at some point the beating stopped and the defendant went and grabbed the deceased's wallet, and it may very well be that he really looked this guy down, let's get the dough and get out of here. Well, wouldn't all that be sorted out at an evidentiary hearing? Well, you've got to get there first. And the way to get there first is by bringing facts that are beyond or above— that are not directly refuted by us in the record, and the record directly refutes any claim that Mr. Counsel, specifically what are you pointing to that refutes that? Well, we look— Give us a list. Pardon me? Give us a list. Okay, give us a list. Well, you know, the best thing to do would be just to read through the court's opinion. First we have the eyewitness testimony. You have Ms. Dominguez who affirmatively identifies the defendant, says she's known him for 10 years, witnesses, sees the stomping, describes his actions in detail. You have someone that puts Ortiz in the soccer group, the guy that was in the— So you have the eyewitness testimony. You have Asensio, who also directly implicates the defendant in kicking, stomping, punching, throwing things at, corral. So then we have physical evidence of property damage. What do we have? We have the DNA evidence. We have the shoe print evidence. We have within the DNA affirmatively identifying the defendant's DNA, affirmatively matching the victim's DNA on the defendant, and then we have the co-defendant is excluded by certain DNA analyses that if the defending person is true that he somehow got in between this, the other gentleman, the other defendant should have been similarly covered in DNA and they weren't. So that evidence, and that's where—and then the court moved on to the print evidence, the footprint evidence. All of that the court found. When you look at the evidence in its totality, I believe the description was if not airtight, it's overwhelming. That evidence that the court found overwhelming of the defendant's guilt is the same evidence that directly refutes the affidavit in this case that he was merely intervening. In fact, this court made on a couple of occasions observations that the evidence directly refuted any claim. The defendant's claim to the trial that he was intervening rather than a participant in the mayhem that led to Mr. Correll's death. Well, one of Justice Gordon's questions to you at the beginning was about the attorney's deficiency and that this attorney, that you said that this attorney, even acting competently, did not have to find this witness in this case. Tell us about that. Okay. So this witness claims that, well, I was there, and I witnessed a portion of the events, and I lived somewhere down the block. So that's what we know. So the question becomes, what is the scope of counsel's duty? Does counsel have to go, literally go to court, do a canvass, and try to find out if anybody saw him? How far away was she then? How far away was she? How far away was this witness from this site? I believe she was somewhere down the block, several houses down. Several houses down? Yes. And that's in the affidavit? I believe it is. She gave her address versus where her mother's was, and I think it's several blocks down. Okay. In this case, the question of whether there was efficient performance, whether there should have been a better, more thorough investigation, assuming there wasn't, again, we're really scant on facts, in the opening petition, but be that as it may, it's pro se, and we give certain lenience there. Liberally construed. Pardon me? We liberally construed it. Indeed. Okay. Proper terminology. Okay, well. So, liberally construing it, it's a close question whether it's arguable on an efficiency problem of the Strickland analysis, but it's not at all close. The prejudice, for all the reasons that we've been talking about, in terms of the evidence, but would there have been prejudice? No, because the evidence used at trial directly refutes the claims in the affidavit and any conclusion or inference that the defendant was acting, was anything other than one of the, if not the major driver for it. This petition does not come to us under a theory of actual innocence. It comes to us strictly. The only thing he did raise in his petition was ineffective assistance. And that is clear. That is abundantly clear. That is, he raised one claim, the claim just described by. Okay, and you're saying that the prejudice prong, he cannot establish that there's a reasonable, arguable, reasonable probability that the outcome would be different. And I may have that phraseology wrong. No, that's correct. Because right when we're looking at ineffective assistance claims at the first stage, there has to be an arguable, reasonable probability, as before, just articulated. And that is not available to the defendant. That is not present here on this record because the affidavit is not viewed in a vacuum, even accepting its well-pleaded, the facts stated in it as well-pleaded facts. When we compare those to the record in this case, what we are left with is a refutation, a direct refutation of the facts in the affidavit. And really, the only fact in the affidavit that needs to be refuted isn't even a fact. It's the, it's the, her reading of his intent. Her claim that, well, he was trying to intervene, intercede. Because otherwise, what she says is totally consistent with the eyewitness testimony that there were three men that attacked and beat Correll to death out in front of a house in 3008 South St. Louis. Other than her, her, you know, and I guess there's not much that the affidavit can offer other than her claim that, well, in my view, he was acting to intervene. Well, isn't that a good enough reason to appoint a lawyer and go and put it into the second stage so a lawyer could look at this and sort it all out? No, it's not a, it's not an ample reason. It's not a good reason at all because it's not, it's not a fact. What she thinks, keep my good thinking, it's not a fact. Well, that didn't really change, did it? I mean, it's well established that on a post-conviction petition review, the court does accept as true all well-pleaded facts, but it does not accept, it does not accept legal conclusions unsupported by specific facts. So I think you have a point when you say that another witness cannot possibly opine her opinion that he was trying to stop the fight. Isn't that what you're saying? That is one of the points. One of the points that you're making is that she can't opine that he was trying to intervene and he was trying to help based on, I don't know what that, I'd have to look more closely at the update. But I understand that position. I understand your position. And I'm sorry. And I'm going to ask counsel on rebuttal about that. And I didn't mean to put one, but I just wanted to extend it out to the other point, which is whatever facts are in the affidavit have to be viewed through the prism of the record as a whole and they have to be sifted through the record. And if the record directly refutes those facts, they're rejected. Right? The only ones that are accepted as true are well-pleaded facts that are not refuted by the record. And here the facts aren't really, they're not really contradictory or merely contradictory to the record. They are refuted by the record based on the DNA evidence. I mean, we're not just, it's not just two eyewitnesses giving a different version of the facts. It's, I wrote a testimony at trial that was corroborated by physical evidence, as we've highlighted, the DNA evidence, the suppression evidence that was introduced at trial. Well, I think the fact is intervening, you know, there's going to be forensic evidence of his DNA, but he's involved in it. And as far as the footprint evidence, do you remember in the Caracol case years ago, a young girl who was abducted from her home and three people who came from Mexico without permission were indicted and they were sent to the gas chambers, okay? And ultimately the Supreme Court found that they were innocent and somebody else committed the crime, all based on a footprint evidence. And it was shown that scientifically footprint evidence is, you know, are not always reliable. Well, here's a little different circumstance because there's, nobody's disputing that the defendant was on the scene. This is not a situation where his footprint is 10 feet away. That's what I'm saying. Some other guy, you know, and the defendant was 10 miles away at the time of the stabbing. This footprint was there because the defendant was there. And the defendant was, he and his daughters were taken into custody shortly after and their shoes were collected and their shoes were, this is not a mistaken identity case. This is not at all like the Caracol case that you're describing. Again, we have to look at this record. In this record, clearly everything collapses down on the defendant based on the evidence. And, again, there's no dispute that the defendant was there, that the defendant was a participant. The question is, what role was that? Did he take? And what the evidence says is that he was one of the people that participated in beating Mr. Corral to death. His story, now, the witness says, well, I heard him say stop the beating and he stood in front of them and that's it. And then from there she said, well, I think he was trying to intervene and stop the beating. He may have been trying to stop the beating at some point later down the line because he wanted to grab the wall and go, but that's either here nor there. The question is, what are the evidence at trial showing? How does that compare to what's being claimed in this affidavit? And when we do that analysis as is required, even at the first stage, we end up with an affidavit that is directly refuted by the record, need not be taken as true, which requires the dismissal of the petition by the trial court. Why don't you sum it up now? Because we're going to have a few more minutes for rebuttal. Thank you, Your Honor. In sum, I would simply say that based on the evidence induced at trial, when looked at and compared to the affidavit, the affidavit is refuted, meaning that the trial court's decision should be affirmed in the affidavit. Thank you. Mr. Houston, you may step up. Brief rebuttal. Ms. Johnson. I do have a question for you. All right. One of the points your opposing counsel made was that the witness is – what is the witness's actual location from this? From – in terms of where she watches this from? Yes. She's on the second floor of 3008 South St. Louis. That's the same building that the witness is, I think, on the top floor of. The witness is on the bottom floor of. Where is it in relation to the address of the beating? I believe it's one house down the street across the street. But that wasn't where she lived. She lived about a block and a half away. Okay, so if we're going – She had her mother's house, which is – The bar is at, I think, 3000 St. Louis. If that kind of moves down the street, this is at 3008 St. Louis House. I believe it's 3010 or 3012 or 311 across the street is where the actual site of the event is. But I'm going back to your ineffective assistance claim. She doesn't even live there. So if our defense attorney was going door-to-door, he would not have found her. Well, he would have found his mother. Who? We know nothing about the mother. So now is your standard. They have to do a neighborhood canvass? No, Your Honor. Our standard is he has to conduct a reasonable investigation. And so a reasonable investigation might not have uncovered her. So how are we arguing that he's ineffective when she doesn't even live there? That's why we have to have counsel on the stand. We can't get an affidavit from counsel. We don't expect to get an affidavit from counsel. That's why I think when my Supreme Court held in Tate that these questions about whether counsel did, in fact, make strategic decisions are fact questions that are too appropriate for first-degree view. Sure, but this case, you know, you have to concede this case is coming to us not on an actual innocence claim. It's coming to us on an ineffective assistance of counsel claim. I think Justice Burke has a point of question here to you, and that is, are we going to hold that the duties of counsel require that person to go, I don't know, everywhere to find a witness? I mean, let's face it. She didn't even live in that address. How would anybody find her? Well, Your Honor, I would suggest the fact that she has been found even without professional investigation would indicate that she could be found. And that in order to know more about what was disclosed in the discovery, I don't know if the counsel. Well, I don't know who found her.  And that is, how do we accept as true that she believes that he was trying to intervene from two houses away? Well, Your Honor, the same reasons that we accept any eyewitness to describe what they see. And what her affidavit actually says is what she sees, not just her conclusion. She says, Adrian kept telling the two men to stop, even stood in front of them to prevent further gloves against the man who was still on the ground. Now, to the degree that maybe we could find some kind of speculation as to the text in there, we don't limit an affidavit to its four corners. I think I said that we can't cater to that. Instead, we get counsel who can develop a further affidavit who knows the right questions to ask, and then we have an evidentiary hearing to determine exactly what the witness saw and when. At this point, I am simply asking that Mr. Garcia have the chance to develop his alignment. And I ask this Court to reverse the judgment on behalf of the second stage of those conditions. All right. Thank you. All right. The case was very well argued, well briefed. It will be taken under advisement. And we thank the attorneys for their participation today. Court stands adjourned.